**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **HARRY KEVIN WADE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **CASE NO. 1:18-cv-2475-TWP-DLP** |
| | ) |
| **INDIANA DEPARTMENT OF CHILD** | ) |
| **SERVICES, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

## I.   Introduction

Every year, more than 200,000 complaints regarding potential child abuse and neglect come into the hotline of the Indiana Department of Child Services ("DCS"). DCS employees handle a rolling caseload of approximately 20,000 open cases at any one time and are the primary agency responsible for the safety and welfare of Hoosier children. To accomplish this enormous mission, DCS contracts with hundreds of outside contractors to provide the necessary services to Indiana's most vulnerable children. Those contractors agree to adhere to certain standards set forth by DCS, including provisions that transgender children will be treated in a safe, supportive, respectful, and non-judgmental manner, irrespective of the personal views any contractor may have.

In this case, Plaintiff Harry Wade has sued several DCS employees for trying to effectuate that very mission. In early 2018, DCS determined that family centered

therapy should be provided to a transgender child and his parents, and referred the case to Lifeline Youth and Family Services, Inc. ("Lifeline"), a DCS contractor, to assign a therapist. Plaintiff, an employee of Lifeline, was assigned to the case. But shortly after being assigned, Plaintiff told the DCS family case manager that he was a Christian minister, didn't understand transgender individuals, and noted that it would be difficult for him to provide services to the child and family without expressing his personal views to them. This violated the contract DCS had with Lifeline, and DCS subsequently informed Lifeline via letter that Plaintiff would no longer be permitted to provide services to DCS clients. By the time the letter was sent by DCS, Lifeline had terminated Plaintiff's employment.

Plaintiff then brought suit, alleging that the private conversation he had with DCS family case manager Kelly McSween was protected by the First Amendment and that DCS's act of prohibiting him from servicing DCS clients was unlawful retaliation.[1] Several of the employees sued—McSween, Decker, May, and Stigdon—had no personal involvement in the decision to prohibit Wade from providing services to DCS clients at all, and so Plaintiff's §1983 suit against them fails before it even begins. As to the remaining Defendants, Plaintiff admits in his complaint that the statements he made to McSween were done in the course of his employment as an employee of Lifeline and as a contractor for DCS. Because his speech wasn't as a citizen about a matter of public concern, his First Amendment retaliation claim fails as well.

---

[1] Wade also alleged that this decision violated his right to Due Process of Law under the 14th Amendment, but the Court dismissed this claim. [ECF 93.]

II.     **Statement of Material Facts Not in Dispute**

     a.  **Information about DCS and its contract with Lifeline Youth and Family Services, Inc.**

The Indiana Department of Child Services receives more than 200,000 complaints of suspected child abuse or neglect to its hotline every year, resulting in approximately 20,000 open cases at any one time. [Exhibit A, Declaration of David Reed, ¶¶ 5-6.] To help service those children and families in need, DCS contracts with hundreds of non-governmental child welfare service providers. [Ex. A, ¶9.] As part of those contracts, DCS frequently refers clients to the contractors to provide services such as counseling or therapy. [Ex. A, ¶9.]

In January of 2018, DCS had a contract with Lifeline to provide certain services, including family therapy. [Ex. A, ¶10; Exhibit E, Contract with Lifeline, p. 23, ¶(c)(1).] The contract specifies that Lifeline will provide services according to the Community Based Services RFP, the most current version of DCS's service standards, and the most current version of DCS's Principles of Child Welfare Services. [Ex. E, p. 1-2, ¶B.] Attachment G of the Community Based Services RFP deals with assurances that Lifeline had to make to DCS to enter into the contract. [Ex. A, ¶14; Exhibit F, Assurances Document attachment to Lifeline Contract.] The assurances document provides the following:

In order to improve outcomes for LGBTQ youth, service providers will provide a culturally competent, safe, and supportive environment for all youth regardless of sexual orientation.  All staff must be sensitive to the sexual and/or gender orientation of the family members, including lesbian, gay, bisexual, transgender or questioning (LGBTQ) children/youth.  Services to youth who identify as LGBTQ must also be provided in accordance with the principles in the Indiana LGBTQ Practice Guidebook.  Staff will use neutral language, facilitate a trust based environment for disclosure, and will maintain appropriate confidentiality for LGBTQ youth.

    a. The LGBTQ Practice Guidebook and LGBTQ Computer Assisted Training (CAT) are both available online.

    b. All DCS child welfare service agencies are required to have all of their new staff understand the information in the LGBTQ Practice Guidebook within 30 days of start date.  New The Guidebook is located at:  http://www.in.gov/dcs/files/GuidebookforBestPracticeswithLGBTQYouth.pdf

    c. All DCS child welfare service agencies are required to have all of their new staff complete the LGBTQ Computer Assisted Training (CAT) within 30 days of start date.  The training is located at: **http://childwelfare.iu.edu/cat/DCS09030/**

[Ex. F, p. 3, ¶22.] The Assurances document also provides a link to the DCS LGBTQ Practice Guidebook. [*Id.*] The guidebook states:

> The Indiana Department of Child Services is committed to meeting the needs of all children, youth and families it serves. Because of the unique needs of youth who identify as LGBTQ, it is vital that social services staff ensure all placements and services are safe and supportive. It is the expectation that providers and staff treat all individuals and families respectfully and non-judgmentally, irrespective of one's personal views of sexual orientation and/or gender identity. Social work best practice dictates that staff be aware of personal biases in order to ensure that equitable services are provided to all individuals and families. The following links are intended to increase awareness, knowledge and appropriate skill sets of social services staff and administrators in the child welfare system, so they may effectively and competently meet the needs of LGBTQ youth and their families.

[Ex. A, ¶16.]

When DCS refers a case to Lifeline, the contract specifies that "[t]he Contractor explicitly agrees that it will only accept referrals for which it has adequate staff and any required credentials at the time of the referral." [Ex. E, p. 3, ¶D]. This provision in the contract ensures Lifeline may decline a referral from DCS in the event it does not have adequate or appropriate staff to handle the referral. [Ex. A, ¶18.] If Lifeline were to decline a DCS referral, DCS would then be able to refer the case to another child welfare contractor. [Ex. A, ¶19.] If, however, Lifeline

4

accepts the referral, they have explicitly agreed that they have adequate staff to handle the referral in accordance with the contract, including abiding by the Community Based Services RFP, the Assurances document, and the LGBTQ Practice Guidebook. [Ex. A, ¶20.] Once a referral is accepted, Lifeline selects a therapist from their staff to provide services to a child and his or her family. [Ex. A, ¶21.] Because Lifeline controls which therapist is selected for any individual case, DCS sets forth the criteria in the Assurances document and the LGBTQ Practice Guidebook to ensure that LGBTQ youth who are in need of services receive services that are objective, effective, non-discriminatory, and free of personal bias. [Ex. A, ¶22.] It would not be feasible for DCS to attempt to screen non-employees for each of their potential personal biases and determine whether those personal biases may conflict with the services a particular child or family requires. [Ex. A, ¶23.] DCS's policy, embodied in the contract, is plain: contractors' employees shall provide services in a non-discriminatory manner, free from any bias from their personal views. [Ex. A, ¶24.]

Under the contract, Lifeline is responsible for ensuring that their employees conform to the professional and technical guidelines and standards applicable to all services and programs that Lifeline provides. [Ex. A, ¶25; Ex. E, p. 35, ¶49.] And the contract specifies that in the event DCS "becomes dissatisfied with the work product of or the working relationship with [an employee] assigned to work on [the] contract and/or those individuals assigned to provide any of the services pursuant to

[the] contract, [DCS] may request in writing the replacement of any or all such individuals, and the Contractor shall grant such request." [*Id.*]

### b. The incident involving the Plaintiff and his prohibition from further involvement in DCS cases

In late 2017 or early 2018, DCS opened a case into the potential abuse or neglect of K.L., a transgender child. [Exhibit B, Declaration of McSween, ¶¶ 5-6.] Defendant Kelly McSween, a DCS Family Case Manager, was assigned to the case. [Ex. B, ¶5.] McSween and her team determined that Family Centered Therapy would be an appropriate course of treatment for K.L. and his family. [Ex. B, ¶7.] DCS referred the case to Lifeline, who accepted the referral and assigned Plaintiff Kevin Wade to the case. [Ex. B, ¶11.] In January of 2018, McSween had a conversation with Plaintiff about K.L.'s case. [Ex. B, ¶12.] Plaintiff indicated to McSween that he was a Christian Minister and that he did not understand transgender individuals. [*Id.*] Plaintiff further stated that he did not agree with the transgender lifestyle and that he thought it would be difficult for him to provide services to K.L. and his family without expressing his personal views to them. [Ex. B, ¶13.] McSween informed her supervisor, Sarah Sutton, of the conversation that she had with Plaintiff. [Ex. B, ¶14.] Sutton relayed the conversation to Defendant Heidi Decker, the DCS Local Office Manager for Vigo County. [Exhibit C, Declaration of Heidi Decker, ¶14.] McSween, Sutton, and Decker decided it would be inappropriate to have Plaintiff provide services to K.L. and his family. [Ex. B, ¶14; Ex. C, ¶15.] McSween had no further involvement in any decision regarding

Plaintiff. [Ex. B, ¶15.] She was not consulted and took no part of the decision of DCS to prohibit Mr. Wade from providing services to DCS clients, and did not even have knowledge of that decision until after it was made and Plaintiff's employment had been terminated by Lifeline. [Ex. B, ¶16.]

Following McSween, Sutton, and Decker's decision to not have Plaintiff provide services to K.L. and his family, Decker asked Sutton to inform Defendant Kristina Killen, the DCS Child Welfare Services Manager and Regional Service Coordinator, of the conversation that occurred between McSween and Plaintiff. [Ex. C, ¶16.] Killen was responsible for addressing any issues that arose with outside service providers, such as Lifeline, in the DCS region that included Vigo County. [Ex. C, ¶17.] Sutton informed Killen about the conversation between McSween and Plaintiff. [Ex. C, ¶18.] After asking Sutton to inform Killen about the circumstances, Decker had no further involvement in any decision regarding Plaintiff. [Ex. C, ¶19.] Decker was copied ("cc'd") on various emails about Mr. Wade between numerous DCS and Lifeline employees following the conversation between McSween and Plaintiff in January of 2018, but she had no substantive involvement in those email conversations before the decision of DCS was made to send a letter to Lifeline indicating that Mr. Wade was no longer permitted to work with DCS clients. [Ex. C, ¶20.] Decker did not become aware of the decision of DCS until she received an email from Killen on January 25, 2018, at 10:14 a.m. indicating that Mr. Wade's employment with Lifeline had been terminated and that DCS was sending a letter to Lifeline. [Ex. C, ¶22.]

After Sutton informed Killen of the conversation between McSween and Plaintiff, Killen contacted Jeremiah Brown at Lifeline via email. [Ex. A, ¶37; Exhibit G, Email to Lifeline.] Around January 22, 2018, Killen talked to Defendant Sarah Sparks—her direct supervisor—and Defendant David Reed—Sparks' direct supervisor. [Ex. A, ¶¶ 38-39.] After discussing the incident and consulting with DCS legal counsel, Reed, Sparks, and Killen decided that Plaintiff would no longer be permitted to provide services to DCS clients under paragraph 49 of the contract with Lifeline. [Ex. A, ¶40; Ex. E, p. 35, ¶49.]

This decision was made because the Plaintiff indicated that he could not provide services to certain DCS clients—specifically transgender clients—without expressing his personal views or having his personal views interfere with the patient\therapist relationship. [Ex. A, ¶41.] In the opinion of Reed, Sparks, and Killen, Plaintiff's view of transgender individuals directly conflicts with the contract DCS maintains with Lifeline, which states that "service providers will provide a culturally competent, safe, and supportive environment for all youth regardless of sexual orientation." [Ex. A, ¶42; Ex. F, p. 3, ¶22]  Plaintiff's views also directly conflicts with the contract DCS maintains with Lifeline in that his view is contrary to the Guidebook for Best Practices with LGBTQ Youth, which provides that, "It is the expectation that providers and staff treat all individuals and families respectfully and nonjudgmentally, *irrespective of one's personal views of sexual orientation and/or gender identity.*" [Ex. A, ¶43;

https://www.in.gov/dcs/files/GuidebookforBestPracticeswithLGBTQYouth.pdf.]
(emphasis added).

Killen received an email from Mr. Brown at Lifeline on Wednesday, January 24, 2018, indicating that Plaintiff was no longer an employee of Lifeline. [Ex. A, ¶44.] DCS sent a letter to Lifeline on January 25, 2018, reflecting its decision to prohibit Plaintiff from working with DCS clients in the future. [Exhibit H, DCS Letter.] DCS never requested that Lifeline take any employment action against Plaintiff other than prohibiting him from being assigned to DCS cases. [Ex. A, ¶¶ 46-47; Ex. H.]

Defendant Jacob May was legal counsel for DCS at the time of allegations in the operative complaint. [Exhibit D, Declaration of Jacob May, ¶3.] Because DCS has not waived the attorney-client privilege, Mr. May's personal involvement in this case is unknown to the Plaintiff and, absent waiver by DCS, will remain unknown. [Ex. D, ¶5.]

Defendant Terry Stigdon, Director of DCS, took no part in the decision regarding Plaintiff and only became aware of the decision to prohibit him from providing services to DCS clients after it was made. [Exhibit I, Declaration of Terry Stigdon, ¶¶ 4-5.]

## III.    Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move for summary judgment if he can demonstrate to the court that there is no genuine issue of material fact and that the moving party is entitled to judgment in his favor as a

matter of law. Fed. R. Civ. P. 56(a). "As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica*, LLC, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted). The substantive law underlying the claim defines which facts are material, and the Court should only refrain from granting the motion where there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts or materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

At the summary judgment stage, a movant must present evidence—as opposed to mere allegations or promises of evidence to be produced in the future—

that would allow a reasonable trier of fact to rule in his favor. "[M]otions for summary judgment must be decided on the record as it stands, not on a litigant's visions of what the facts might someday reveal." *Maldonado Denis v. Castillo Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994).

## IV. Argument

### a. Defendants McSween, Decker, May, and Stigdon did not have the personal involvement required for liability under §1983

Plaintiff brings his First Amendment claim against all Defendants under 42 U.S.C. §1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (internal citations omitted). "Individual liability pursuant to § 1983 requires personal involvement in the alleged constitutional deprivation. The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) *the alleged misconduct*." *Carmody v. Bd. of Trustees of Univ. of Illinois,* 893 F.3d 397, 401 (7th Cir. 2018) (emphasis added) (internal citations omitted).

In this case, the misconduct that Plaintiff alleges is that he was prohibited from having any contact or being able to provide any counseling services to any DCS clients, as evidenced by the letter DCS sent to Lifeline. *See* [Plaintiff's Third Amended Complaint, ECF 87, ¶¶ 33-34; Ex. H.] But as evidenced by the sworn

statements in this matter, Defendants McSween, Decker, May, and Stigdon had no personal involvement in "alleged misconduct" complained of by the Plaintiff.[2]

Defendant McSween relayed the conversation that she had with Plaintiff to her supervisor, Sarah Sutton, and McSween, Sutton, and Defendant Decker decided that Plaintiff should not be assigned to the case involving K.L. [Ex. B, ¶14.] However, Defendant McSween had no further involvement in any decisions regarding Mr. Wade and did not even know about DCS's decision regarding Mr. Wade until after it occurred. [Ex. B, ¶¶ 15-16.]

Defendant Decker decided with Defendant McSween and Sarah Sutton to not have the Plaintiff provide counseling to K.L. and his family. [Ex. C, ¶15.] Defendant Decker also asked Sutton to tell Defendant Killen what had occurred. [Ex. C, ¶16.] But Defendant Decker did not have any substantive involvement in the decision to prohibit Mr. Wade from providing services to DCS clients, was not consulted regarding this decision, and did not become aware that the decision had been made until after Lifeline had already terminated Plaintiff's employment. [Ex. C, ¶¶ 19-22.]

Defendant May was legal counsel for DCS at the time of the allegations in the complaint. [Ex. D, ¶¶ 3-4.] DCS has not waived the attorney-client privilege as to any involvement, decisions, or advice provided by Defendant May, and, absent waiver, Plaintiff will be unable to show any personal involvement by Defendant May.

---

[2] Defendant May does not affirmatively allege he was not involved in any decision made in this case, but instead states that his involvement, if any, is unknown to Plaintiff and protected by attorney/client privilege.

Defendant Stigdon is the Director of DCS. [Ex. I, ¶2.] She took no part in the decision to prohibit Plaintiff from providing services to DCS clients or sending the prohibition letter to Lifeline. [Ex. I, ¶5.] That decision was handled by Deputy Director David Reed and his staff. [*Id.*] She became aware of the events involving Plaintiff only after they occurred. [Ex. I, ¶4.]

Plaintiff cannot demonstrate a causal connection between Defendants McSween, Decker, May, or Stigdon and the misconduct he alleges: prohibiting him from further contact with DCS clients. As noted above, McSween, Decker, and Stigdon did not request, were not consulted about, and played no part in the decision to prohibit Plaintiff from providing services to DCS clients. In fact, all of these Defendants only learned about this action after it had occurred. Absent evidence to the contrary, Plaintiff cannot show that these Defendants had the requisite "personal involvement" to support §1983 liability. Further, the case against Defendant May is untenable: Plaintiff can show no personal, causal involvement because any evidence is protected by the attorney-client privilege. The best Plaintiff can produce is that Defendant May was "cc'd" on the letter to Lifeline, [Ex. H], and that he was involved in various emails that have been provided to the Plaintiff but are redacted.

Based on the foregoing, Defendants McSween, Decker, May, and Stigdon should be granted summary judgment because they lacked the personal involvement necessary for §1983 liability.

13

### b. *Connick, Pickering,* and *Garcetti* control whether speech made by a public employee or contractor is protected under the First Amendment

In *Pickering,* the Supreme Court held that public employees do not relinquish their constitutional rights to speak as citizens on issues of public concern solely because of their employment. *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois,* 391 U.S. 563, 568 (1968). Pickering was a public school teacher who was dismissed from his position after he had written a letter to the local newspaper that was critical of the board of education and the district superintendent. *Id.* at 564. The Court held that the letter was regarding a "matter of legitimate public concern" upon which "free and open debate is vital to informed decision-making by the electorate," and determined that Pickering's firing violated the First Amendment. *Id.* at 571-572.

*Pickering* and its progeny enumerated a two-part inquiry to guide the interpretation of First Amendment protections given to public employee speech. "The first [part] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006) (internal citations omitted). And as to whether

14

an employees' speech is protected when it is made at work, *Garcetti* held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. *Garcetti,* then, created a "threshold inquiry" when evaluating employee free speech claims: "whether the employee was speaking as a citizen." *Mills v. City of Evansville*, 452 F.3d 646, 647–48 (7th Cir. 2006). Only if the answer to this question is "yes" does a court even inquire into the content of the speech. *Id.*

For example, Garcetti was a Los Angeles deputy district attorney who had written a memorandum to his supervisor indicating that he believed an affidavit used to obtain a search warrant contained serious misrepresentations. *Id.* at 420. Garcetti was subsequently reassigned to another division inside the office, and he alleged that his employer had unlawfully retaliated against him for expressing protected speech. *Id.* at 414-415. The Supreme Court held that because his speech was made as a deputy district attorney—that is, speech related to his job duties—he was not acting as a private citizen and therefore didn't enjoy any First Amendment protection. *Id.* at 421-422 ("The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.").

### c.  *Umbehr* extended the traditional *Connick-Pickering* test for determining whether speech is constitutionally protected to government contractors like Plaintiff

The holdings of *Pickering* and *Garcetti* were extended to independent government contractors in *Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr,* 518 U.S. 668 (1996). Umbehr, a trash hauler who had has a contract with the Board of County Commissioners of Wabaunsee County, frequently spoke out at meetings of the Board, wrote letters to the editor in local newspapers, and made various allegations against the Board regarding the mismanagement of taxpayers' money. *Id.* at 672. The Board took this criticism poorly and terminated Umbehr's contract with the county. *Id.* Umbehr brought suit alleging First Amendment retaliation, and the Supreme Court granted certiorari to determine whether the First Amendment protected independent contractors from termination of at-will government contract in retaliation for protected First Amendment activity. *Id.* at 670. Ultimately, the Court determined that the *Pickering* balancing test appropriately accommodated the differences between employees and independent contractors and should be used in determining whether the government's action against an independent contractor violates the First Amendment. *Id.* at 678.

There can be no legitimate question that Plaintiff, as an employee of Lifeline providing services to DCS clients under the Lifeline contract, was a government contractor under the *Umbehrs* framework. Plaintiff's interaction with DCS clients only existed by virtue of DCS's contract with Lifeline. [Complaint, ECF 87, ¶7,

"Wade worked for (former) Defendant Lifeline as a counselor to clients sent by Defendant Department of Child Services . . . .".] Had DCS not referred the case to Lifeline under the contract, Plaintiff would have had no opportunity to be assigned to K.L.'s case and speak with McSween about it in January of 2018. [Ex. A, ¶32.] Any notion that Plaintiff was a purely private citizen when he spoke with DCS Family Case Manager McSween about providing therapy to K.L.—a child who had been removed from his home by the State because he was in need of services, [Ex. B, ¶5]—defies reason.

Therefore, for the Plaintiff to prevail on a claim of First Amendment retaliation against each defendant, he must first establish that (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter him from exercising his First Amendment rights in the future; and (3) his speech was the motivating factor in the employer's adverse employment action. *Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 670 (7th Cir.2009). If he can establish this *prima facie* case, "the burden shifts to the employer to demonstrate that it would have taken the same action in the absence of the protected speech." *Id.*

>    **d.  Plaintiff's First Amendment claims against all Defendants fail because his speech was made pursuant to his official duties as a government contractor and was not on a matter of public concern**

To determine whether Plaintiff engaged in constitutionally protected speech, the threshold question under *Garcetti* is whether "the employee was speaking as a

citizen." *Spiegla v. Hull,* 481 F.3d 961 (7th Cir. 2007). Plaintiff was not acting as a

citizen here. As evidenced by Plaintiff's complaint, Defendant McSween asked

Plaintiff to begin Family Centered Therapy ("FCT") for K.L. and his family as part

of Plaintiff's duties with Lifeline. [Complaint, ¶9.] Plaintiff informed McSween that

"his personal background and beliefs as a Christian minister could serve to harm

the therapeutic process because, as a Christian Minister, his exposure to

transgender individuals was nonexistent, and his only frame of reference for such

conditions was religious in nature." [Complaint, ¶10.] "Wade viewed these as

potential issues which could make it difficult to effectively carry out the FCT

process, which involves months of meetings between the therapist and the family

and requires a significant amount of trust and openness." [Complaint, ¶11.] Even

accepting Plaintiff's characterization of that conversation as entirely true, it is

difficult to see how Plaintiff could suggest that the conversation he had with

McSween was anything other than "pursuant to his official duties" as a contractor

for the State by virtue of his employment with Lifeline. *Garcetti,* 547 U.S. at 421.

His conversation was (1) with McSween, the assigned DCS Family Case Manager

for K.L.'s case; (2) about Plaintiff's assignment as a therapist for K.L., a child in the

DCS system; and (3) expressing his view that his background may harm his ability

to provide therapy for K.L. and his family—precisely the "official duty" DCS had

requested he perform as a therapist under the contract with Lifeline. In fact,

Plaintiff could not have had a conversation about K.L. and his treatment outside of

his "official duty" as a therapist without both violating the confidentiality

requirements of DCS's contract with Lifeline, [Ex. E, p. 7, ¶O], and violating state law confidentiality requirements regarding DCS case material. Ind. Code § 31-33-18-1. At bottom, Plaintiff's conversation with McSween was squarely within his official duties—consulting with DCS family case managers regarding therapy of a DCS client—and therefore falls outside the realm of constitutional protection under *Garcetti*.

Even if this Court were to find that Plaintiff's conversation with McSween was not part of his official duties pursuant to the contract with Lifeline, his conversation still wouldn't receive constitutional protection because it wasn't regarding a "matter of public concern." "When employee expression cannot be fairly considered as relating to any matter of political, social, or other *concern to the community*, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Here, Plaintiff's discussion of his personal religious views and views on transgender individuals, as they related to him providing therapy services to K.L. and his family, cannot fairly be characterized as a "community concern." As noted above, any concerns regarding the therapy provided to K.L. were confidential under the Lifeline contract and state law. No public discourse on the issues of religion or the issues facing transgender individuals could have possibly come from Plaintiff's conversation with McSween. And, notably, Plaintiff has not complained that the contract or DCS's *policies* are

flawed, but merely that in this *one* case he had reservations about providing services to a transgender client.

This Court has recently considered a case regarding speech in the course of an employee's official duties regarding both religion and gender dysphoria. In *Kluge v. Brownsburg Community Schools Corporation,* 432 F. Supp. 3d 823 (S.D. Ind. 2020), Kluge was a school teacher at Brownsburg Community Schools who was a "professing evangelical Christian who strives to live by his faith on a daily basis." *Id.* at 833. He believed that God created mankind as either a male or a female with a fixed gender. *Id.* After the school corporation instructed teachers to refer to students using the names and genders listed in a school database, which Kluge believed constituted preferred names based on some students' gender dysphoria, he told the superintendent that doing so would violate his religious beliefs. *Id.* After some back and forth, Brownsburg refused to accommodate Kluge and he filed suit. *Id.* at 835-836.

Kluge asserted that by refusing to call students by the names listed in the school database, he was engaging in protected speech by refusing to speak on the mental disorder known as gender dysphoria. *Id.* at 837. Brownsburg argued that Kluge wasn't engaging in protected speech at all, and was instead speaking as an employee of the school—not a private citizen—and that using the names in the school database wasn't a matter of public concern.  While the court noted that the fact that an employee speaks inside his workplace or that his speech concerns the subject matter of his employment are not dispositive of the issue, the court found

20

that Kluge's speech in addressing students according to the school database was not protected under the First Amendment because it was part of his job duties. *Id.* at 839. Specifically, the court found that he was not criticizing the *policy* of the school, but the actual act of addressing his students, something that was part and parcel to his job. *Id.* The court also found that the issue was not a matter of public concern because, while the treatment of individuals based on their gender identity is an issue of great public importance, Kluge was not conveying a message concerning such matters to the public. *Id.* Specifically, "the act of referring to a particular student by a particular name did not contribute to the broader public debate on transgender issues", and therefore was not "the kind of speech that was valuable to public debate" and protected by the First Amendment. *Id.*

As in Kluge, Plaintiff's speech here was directly related to his duties as a therapist and did nothing to advance the public discourse around either his religious views or the issues surrounding transgender individuals. Plaintiff's speech, like Kluge's, also was not critical of the overarching *policy* implemented by DCS through the contract with Lifeline but was only concerning a single conversation had related to a single therapy assignment. For those reasons, his speech was not constitutionally protected and summary judgment should be granted for all Defendants on this claim.

**e. Because there was no First Amendment violation, Plaintiff is not entitled to injunctive relief**

As noted in the sections above, Plaintiff spoke pursuant to his official duties as a contractor for DCS via his employment with Lifeline and his speech wasn't on a matter of public concern. Given that, he is not entitled to injunctive relief against Director Stigdon in her official capacity because there has been no First Amendment violation.

## V.     Conclusion

Because Defendants McSween, Decker, May, and Stigdon did not have any personal involvement in the decision to prohibit Plaintiff from providing services to DCS clients, no liability can attach under §1983 and judgment should be rendered in their favor. Additionally, because Plaintiff spoke in the course of his official duties as a contractor with DCS, and spoke on a matter that was not of public concern, all Defendants are entitled to judgment in their favor. Finally, because there was no First Amendment violation, Plaintiff is not entitled to any injunctive relief against Director Stigdon in her official capacity.


Respectfully Submitted,

CURTIS T. HILL, JR.
Indiana Attorney General
Atty. No. 13999-20

Date: <u>September 21, 2020</u>          By:    Jordan M. Stover
Deputy Attorney General
Atty. No. 29502-49
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN  46204-2770
Phone:       (317) 232-7154
Fax:  (317) 232-7979

Email:  Jordan.Stover@atg.in.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 21, 2020, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system.


Jordan M. Stover
Deputy Attorney General


OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South – 5th Floor
302 W. Washington Street
Indianapolis, IN  46204-2770
Telephone:   (317) 232-7154
Fax:              (317) 232-7979
Email:            Jordan.Stover@atg.in.gov