UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HARRY KEVIN WADE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO. 1:18-cv-2475-TWP-DLP |
| | ) |
| INDIANA DEPARTMENT OF CHILD | ) |
| SERVICES, et al., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

### I.  Introduction

Plaintiff Harry Wade filed his Motion for Summary Judgment arguing that the Defendants retaliated against him in violation of the First Amendment for his speech regarding transgender individuals during a DCS case meeting with Defendant Kelly McSween. [ECF 119.][1] Plaintiff isn't entitled to summary judgment because the facts he relies on to support resolution of his claims as a matter of law are not based on his personal knowledge or otherwise admissible evidence. Additionally, Plaintiff misstates and misapplies the legal standards relevant to the First Amendment rights of government contractors acting in the course of their official duties. Because of those failures, Plaintiff's motion for summary judgment should be denied.

### II.  Statement of material facts in dispute or which are not supported by admissible evidence

---
[1] Defendants also filed their Motion for Summary Judgment on the same day as Plaintiff.

As an initial matter, Rule 56 of the Federal Rules of Civil Procedure requires that affidavits or declarations used to support a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). While "personal knowledge" may include inferences and opinions, those inferences must be substantiated by specific facts or be grounded in observations or other first-hand experience. *Drake v. Minnesota Min. & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir. 1998); *United States v. Joy*, 192 F.3d 761, 767 (7th Cir.1999). Conclusory allegations should be disregarded on summary judgment. *Id.* As detailed below, numerous assertions of "fact" in Plaintiff's MSJ are only supported by conclusory allegations from Plaintiff's affidavit, [Plaintiff's MSJ, Ex. A], and therefore should not be considered by this Court.

### a. Violation of Policies

Plaintiff asserts that he did not violate any DCS policies regarding providing counseling services to DCS clients or to the transgender client that was referred to him by Lifeline, his employer, in January of 2018. [ECF 120, Plaintiff's Memorandum of Law in Support of His Motion for Summary Judgment ("Plaintiff's MSJ"), p. 3.] He cites only his affidavit in support of this conclusion [Plaintiff's MSJ, Ex. A., ¶¶ 15-18.] Plaintiff does not support this conclusion with copies of DCS policies, he does not say what specific policies he is referring to, and he does not show that he is competent to testify on DCS policies as a general matter—all things that would allow this Court to evaluate whether Plaintiff's actions did or did not

2

violate DCS policy. Instead, Plaintiff simply provides a naked conclusion—he did not violate DCS policies—and asks this Court to take his word for it. This Court should decline that invitation. *See Drake, supra; Palmer v. Marion County,* 327 F.3d 588, 596 (7th Cir. 2003) ("self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment.")

Additionally, this fact is disputed by the evidence cited in Defendants' Motion for Summary Judgment, [ECF 122], and Memorandum in Support ("Defendants' MSJ"). [ECF 123.]  Specifically, the evidence shows that when DCS refers a case to a contractor (such as Lifeline), who then assigns it to one of their employees (like Plaintiff), the contract specifies that services provided to DCS clients will be provided according to several specified policies and documents. [ECF 123, p. 3; Ex. A, ¶¶ 10, 14, 16; Ex. E, p. 1-2, ¶B; Ex. F, p. 3, ¶22.] The DCS policies cited in the contract specify that when providing services to LGBTQ youth, "it is the expectation that providers and staff treat all individuals and families respectfully and non-judgmentally, *irrespective of one's personal views of sexual orientation and/or gender identity.*" [Defendants' MSJ, p. 4; Ex. A, ¶16. (emphasis added)] Plaintiff told McSween that he did not agree with the transgender lifestyle and he thought it would be difficult to provide counseling services to K.L. and his family without expressing his personal views to them about transgenderism. [Defendants' MSJ, Ex. B, ¶13.] In DCS's view, this violated its policies for dealing with LGBTQ youth. [Defendants' MSJ, Ex. A, ¶ 41.] Given this evidence, Plaintiff's conclusion that he

3

violated no DCS policy isn't supported by admissible evidence and is directly contradicted by evidence provided by Defendants.

### b. Defendants affirmative steps to have Plaintiff's employment with Lifeline terminated

Plaintiff next asserts that after he discussed his religious beliefs with McSween, she took affirmative action with the agreement and cooperation of the other named Defendants to ensure Plaintiff's termination of employment with Lifeline. [Plaintiff's MSJ, p. 3.] Additionally, he claims that Defendants knew or should have known that the vast majority of Lifeline's client referrals came from DCS and that Defendants "knew or should have known that Lifeline would take whatever steps were necessary to ensure DCS's pleasure with Lifeline's services, including terminating Wade." [*Id.*] Plaintiff provides three sources of evidence to support these purported facts. First, he cites to his own declaration. [Plaintiff's MSJ, Ex. A, ¶¶ 20-23.] Second, Plaintiff cites an email chain between DCS employees and Lifeline employees. [Plaintiff's MSJ, Ex. D.] Third, Plaintiff cites DCS's interrogatory responses to Plaintiff. [Plaintiff's MSJ, Ex. E.]

None of these sources of evidence provide support for Plaintiff's conclusions. In Plaintiff's Exhibit D, the email chains do not even support the inference that any Defendant—let alone all of them—took affirmative action to have Plaintiff's employment with Lifeline terminated. In an email between Defendant Killen and Jeremiah Brown of Lifeline, after reviewing what had occurred, Killen asks Brown: "How is Lifeline going to ensure that Mr. Wade is able to [refrain from expressing his personal views] while working with DCS families and children?" [Plaintiff's

4

MSJ, Ex. D, p. 4-5.] This statement implies a continuing working relationship with both Lifeline and Plaintiff, not an anticipation that Plaintiff will be terminated. Killen then asks for Plaintiff's training records for DCS's review, as well as Lifeline's training materials related to cultural competency. [*Id.*] Brown later responds with Lifeline's training materials Killen requested, Plaintiff's training records, and then Brown indicates that "disciplinary action has been taken with Mr. Wade and he is no longer with Lifeline Youth and Family Services." *[Id.* at 6-7.] Killen then forwards Brown's email indicating Plaintiff's employment was terminated to other staff inside of DCS. [*Id.* at 6.] Nowhere in these emails is there any evidence that Defendants requested or suggested that they would like Lifeline to terminate Plaintiff's employment, nor are there any statements from which a rational inference could be drawn to suggest the Defendants wanted such action to be taken.

In Plaintiff's Exhibit E, none of the interrogatory responses support the inference that any Defendant took affirmative action to have Plaintiff's employment with Lifeline terminated. The most that can be said for the interrogatories is that Defendants Killen, Sparks, and Reed decided to ask Lifeline to no longer assign Wade to DCS cases, [Plaintiff's MSJ, Ex. E, p. 5], but there is nothing in those responses about Plaintiff's employment relationship with Lifeline.

With Plaintiff's Exhibits D and E providing no evidentiary support for the conclusion that Defendants took affirmative action to have Plaintiff's employment

5

with Lifeline terminated, the only remaining evidentiary citation in Plaintiff's MSJ is to his own affidavit. It states:

> 20. After and because I expressed my religious beliefs, McSween took affirmative action with Lifeline to ensure my termination of employment with Lifeline.
>
> 21. In addition, McSween obtained the agreement and the cooperation of the other named Defendants to obtain my termination of employment with Lifeline.
>
> 22. Defendants knew or reasonably should have known that the vast majority of Lifeline's client referrals came from DCS.
>
> 23. Therefore, Defendants knew or reasonably should have known that Lifeline would take whatever steps were necessary to ensure DCS's pleasure with Lifeline's services, including terminating me.

[Plaintiff's MSJ, Ex. A.] These statements are Plaintiff's opinions or generalized conclusions that lack evidentiary support, and he does not show why he would be competent to testify on what action each Defendant took or what each Defendant knew or should have known at the time. Fed. R. Civ. P. 56(c)(4). Plaintiff does not provide evidence of what affirmative action McSween took to have his employment terminated, does not provide any evidence that McSween conspired with other Defendants to have Plaintiff's employment terminated, does not provide any evidence that any of the individual Defendants knew or should have known that Lifeline received almost all of their referrals from DCS[2] (or provide any evidence that Lifeline does, in fact, receive a majority of their referrals from DCS), and does not provide any evidence that Defendants knew or should have known that Lifeline

---

[2] In fact, Plaintiff indicates in his declaration that provides counseling services outside of those to DCS. [Plaintiff's MSJ, Ex. A, ¶ 7.]

6

would do whatever is necessary to ensure DCS remained happy with Lifeline. Absent factual support or any showing that Plaintiff is competent to opine on these matters, the statements in paragraphs 20-23 of Plaintiff's affidavit should not be considered by this Court.

Additionally, Plaintiff's purported facts are contradicted by the sworn declarations of the Defendants, who actually have knowledge of their own actions. McSween did not have any involvement in any decisions regarding Plaintiff[3] and didn't even know about DCS's decision to prevent Plaintiff from having DCS cases until after it was made and Plaintiff's employment had been terminated by Lifeline. [Defendants' MSJ, Ex. B, ¶¶ 15-16.] Defendant Decker did not have any substantive involvement in the decision to prohibit Mr. Wade from providing services to DCS clients, was not consulted regarding this decision, and did not become aware that the decision had been made until after Plaintiff's employment had been terminated by Lifeline. [Defendants' MSJ, Ex. C, ¶¶ 19-22.] Defendant May was legal counsel for DCS at the time of the allegations in the complaint and as such, his substantive involvement in any decision is unknown to Plaintiff. [Defendants' MSJ, Ex. D, ¶¶ 3-4.] Defendant Stigdon is the Director of DCS and she took no part in the decision to prohibit Plaintiff from providing services to DCS clients or sending the prohibition letter to Lifeline. [Defendants" MSJ, Ex. I, ¶5.] And while Defendants Killen, Sparks, and Reed did decide to prohibit Plaintiff from providing services to DCS clients in the future, they did not request or require Lifeline to take any

---

[3] Other than to have Mr. Wade not staff the single case involving the transgender child.

7

employment action against Plaintiff other than his removal from DCS cases under the contract. [Defendants' MSJ, Ex. A, ¶¶ 46-47.]

### III. Argument

#### a. *Pickering* was extended to independent contractors by the Supreme Court in *Umbehr* and controls this case

Plaintiff argues that because he was not an employee of DCS—but was instead an employee of Lifeline, a DCS contractor—the *Pickering* balancing test used by courts to determine whether an employee's speech is protected by the First Amendment is inapposite. [Plaintiff's MSJ, p. 6.] In Plaintiff's view, his speech to McSween regarding K.L.'s case was made as a private citizen. [*Id.* at 7.] And so Plaintiff argues that it is irrelevant if his speech was offensive to any DCS employees and it doesn't matter if it violated DCS's or Lifeline's policies—because he was speaking as a private citizen on a religious matter, DCS could take no action against him. [*Id.*]

Plaintiff fails to address the Supreme Court's decision in *Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr,* 518 U.S. 668 (1996), which extended the holding of *Pickering* to cases involving government contractors. Defendants addressed *Umbehr* and its application to this case extensively in their motion for summary judgment, and so they won't rehash the same arguments here. [Defendants' MSJ, p. 16-17.] But Plaintiff's assertion that his speech to McSween made entirely during the performance of his duties under Lifeline's contract with DCS, [Defendants' MSJ, Ex. A, ¶¶

10, 30-32], is not subject to any limitation would have far-reaching consequences for the efficient delivery of government services. Under Plaintiff's view, he could attend a religious rally where he proclaimed that all LGBTQ people were destined for eternal damnation and should be put to death (or even say this to a DCS family case manager), and show up for work the next day to provide counseling services to an LGBTQ client without repercussion. [*See* Plaintiff's MSJ, p. 7 ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection. Therefore, it is irrelevant that McSween or the other Defendants found Wade's speech or opinions offensive.") (internal citations omitted).]

      That position is absurd. As the Supreme Court observed in *Umbehr*, when the government exercises contractual power, as here, its interests as a public service provider are implicated, and "deference is . . . due to the government's reasonable assessments of its interests as contractor." *Umbehr,* 518 U.S. at 678. The Court held that the *Pickering* balancing test could be appropriately applied to government contractors, accommodating any differences between employees and contractors while accounting for the government's interest in promoting the efficient delivery of public services. *Id.* at 676, 678. The government's interest in the efficient delivery of public services "is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer," and the Supreme Court has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to

9

justify restrictions on the speech of the public at large." *Id*. at 676. The practical application of this reasoning is obvious: it would be unimaginable, for example, if the government was forced to tolerate overt racism espoused by a government contractor in a public-facing position because that speech was otherwise protected, no matter the deleterious effect that person might have on the efficient delivery of government services.

Plaintiff argues that the standard set forth in *Bridges v. Gilbert* applies to this case. 557 F.3d 541 (7th Cir. 2009). There, Bridges sued several employees of the Wisconsin Department of Correction for retaliation because he provided an affidavit in a wrongful death lawsuit brought by the estate of a deceased prisoner. *Id.* at 544. In deciding the case, the Seventh Circuit discussed whether to apply the "public concern" standard set forth in *Pickering, Connick, and Garcetti*—all cases involving the First Amendment rights of employees—to cases involving prisoners. *Id.* at 549-550. After an analysis of cases from the Supreme Court and other circuits, the *Bridges* court held that the requirement that a plaintiff show that his speech was made "on a matter of public concern" in employment cases shouldn't apply to prisoner cases because the threshold concerns regarding speech in each context were very different. *Id.* at 550. Specifically, the "public concern inquiry was created to maintain the delicate balance between a citizen's right to speak (and the public interest in having thoughtful debate) and the employer's need to effectively provide government services," where the "legitimate penological objectives test was created to preserve some free speech rights for prisoners in a restrictive and challenging

10

environment where prison officials must be focused on crime deterrence, prisoner rehabilitation, and internal prison security." *Id.*

Plaintiff's reliance on *Bridges* is puzzling—Mr. Wade was not incarcerated at the time he spoke to McSween, and so the "legitimate penological interests" test to determine if speech is protected by the First Amendment clearly has no application to this case. To the extent that Plaintiff is simply trying to draw a comparison, common sense counsels that speech of an independent contractor is closer to that of a state employee than an inmate incarcerated by the state. But comparisons aside, the Seventh Circuit settled this matter in *Khuans*, where it held that "[i]n *Umbehr*, the Supreme Court indicated that when an independent contractor has been fired because of her exercise of free speech, we must balance interests pursuant to *Pickering*, adjusting for any differences between the employee and independent contractor situations." *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1019 (7th Cir. 1997).

Plaintiff was an employee of Lifeline, providing services to DCS clients under Lifeline's contract with DCS. [Defendants' MSJ, Ex. A, ¶¶ 10, 30-32; Plaintiff's MSJ, Ex. A, ¶¶ 6, 10.] As such, his claim of First Amendment retaliation was subject to the *Pickering* framework as extended by *Umbehr* and recognized by *Khuans*. Plaintiff must show that the action taken against him by Defendants "was motivated by his speech on a matter of public concern," *Umbehr,* 518 U.S. at 685, and that his speech was made as a private citizen— not pursuant to his official duties as a contractor. *Garcetti v. Ceballos*, 547

11

U.S. 410, 421 (2006)  For the reasons set forth in the Defendants' MSJ, sections IV(b)-(d), and because Plaintiff does not address in his motion for summary judgment whether his speech to McSween was as a private citizen on a matter of public concern, Plaintiff is not entitled to judgment as a matter of law and his motion for summary judgment should be denied.

### b.  If *Bridges* does control this case, Defendants are entitled to qualified immunity because their actions didn't violate clearly established law

If the Court is inclined to agree with Plaintiff that his speech could not be subject to any action by DCS, no matter the content nor that it was uttered while performing duties under a DCS contract, Defendants are entitled to summary judgment because it was not clearly established at the time that this conduct violated the constitution.

"[Q]ualified immunity protects government agents from liability when their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. This involves two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (internal citations omitted). It "provides ample room for mistaken judgments and protects government officers except for the

plainly incompetent and those who knowingly violate the law." *Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999) (internal citations omitted).

Defendants cannot find a single case in the Seventh Circuit that has held that a litigant in Plaintiff's position—an employee of a company performing duties under that company's contract with a state agency—is not subject to the standards set forth in *Pickering, Umbehr,* and *Garcetti*. Plaintiff's view that a litigant in his position cannot be subject to <u>any</u> speech restriction regarding his religious beliefs, no matter if that speech is expressed privately, during the course of employment, and regardless of how much that speech might interfere with the efficient delivery of government services is, at best, novel. In the end, it was not clearly established at the time that a state agency and its employees were prohibited from taking any action against an independent contractor who they believed had espoused a view of transgenderism that was at odds with their policies regarding the treatment of LGBTQ youth.

## IV. Conclusion

For the reasons set forth above, Plaintiff has failed to support his factual claims with admissible evidence to show that his speech was protected under the standards the Supreme Court has set forth in *Pickering, Umbehr,* and *Garcetti,* so he is not entitled to judgment as a matter of law. Additionally, even taking all of his alleged facts and arguments are true, Defendants are entitled to judgment under the doctrine of qualified immunity because it was not clearly established at the time that their actions were unconstitutional.

                                                                     Respectfully Submitted,

                                                                       CURTIS T. HILL, JR.
                                                                       Indiana Attorney General
                                                                       Atty. No. 13999-20

Date: <u>October 19, 2020</u>        By:    Jordan M. Stover
                                                                      Deputy Attorney General
                                                                      Atty. No. 29502-49
                                                                      Indiana Government Center South – 5th Fl.
                                                                      302 W. Washington Street
                                                                      Indianapolis, IN  46204-2770
                                                                      Phone:  (317) 232-7154
                                                                      Fax:  (317) 232-7979
                                                                      Email:  Jordan.Stover@atg.in.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

                                                                      Jordan M. Stover
                                                                      Deputy Attorney General

OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South – 5th Floor
302 W. Washington Street
Indianapolis, IN  46204-2770
Telephone:  (317) 232-7154
Fax:            (317) 232-7979
Email:          Jordan.Stover@atg.in.gov