UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HARRY KEVIN WADE, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO. 1:18-cv-2475-TWP-DLP |
| | ) |
| INDIANA DEPARTMENT OF CHILD | ) |
| SERVICES, et al., | ) |
| | ) |
|    Defendants. | ) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

### I.   Introduction

Plaintiff's response to Defendants' motion for summary judgment [ECF 124] ("Response") provides no legal or factual foundation to support his First Amendment retaliation claim. Except for a brief footnote, the Plaintiff does not address the Supreme Court's holding in *Umbehr,* which applied the *Pickering* test to cases involving government contractors. Plaintiff also continues to rely on conclusory and otherwise unsupported statements to support each Defendant's personal involvement and liability in this matter.

The parties have each filed motions for summary judgment and responses to those motions. Defendants now submit this reply in support of their motion for summary judgment. However, because the issues being litigated on these cross-motions are substantially the same, Defendants hereby incorporate their previous

Motion for Summary Judgment and Brief in Support, [ECF 122, 123], and Response to Plaintiff's Motion for Summary Judgment, [ECF 125], by reference, and will provide citation to those documents to avoid unnecessary duplication.

In the end, the combined briefing and admissible evidence in this case leads to the following undisputed facts and conclusions of law that require the Court to enter summary judgment for Defendants:

1. Plaintiff was employed by Lifeline and working pursuant to a contract with the Indiana Department of Child Services, so *Pickering* and *Garcetti* control this case as applied by *Umbehr;* [Defendants' Response, p. 11-12.]

2. Plaintiff's speech to Family Case Manager McSween during a case consultation was made pursuant to his official duties as a DCS contractor, and was therefore entitled to no First Amendment protection under *Garcetti*; [Defendants' MSJ, p. 17-18.]

3. Plaintiff's speech to McSween, in the context of a confidential DCS case consultation, was not made on a matter of public concern and was therefore entitled to no First Amendment protection. [Defendants' MSJ, p. 19-21.]

4. Because Plaintiff does not address Defendants' arguments that his speech wasn't protected under *Pickering* or *Garcetti,* this Court should not consider the second prong of the *Pickering* analysis regarding whether DCS had adequate justification for its action;

5. But if the Court does find Plaintiff's speech protected by the First Amendment, Defendants had provided ample evidence to justify their action as described below.

## II. Defendants McSween, Decker, and May did not have the requisite personal involvement to support liability under § 1983

### a. Personal Involvement of Defendants McSween and Decker

Plaintiff argues that because each of the named Defendants "directly participated in the retaliation against [him]," each of them can be held personally liable under § 1983. [Plaintiff's MSJ, p. 9.] Not so. Simply showing that each Defendant had some knowledge of the events that underpin this case and took some action related to it is insufficient to show that each of them had the requisite "personal involvement" in the alleged *constitutional violation itself* to support liability. Section 1983 requires *causation* for personal liability. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978) ("Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B "caused" A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent.") The personal involvement of a defendant must have *caused* the constitutional deprivation itself. *Palmer,* 327 F.3d at 594; *Colbert v. City of Chicago,* 851 F.3d 649 (7th Cir. 2017) ("The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct."). Here, the constitutional deprivation that Plaintiff alleges is that his employment with Lifeline was terminated and he was prohibited from receiving future DCS case referrals. Therefore, he must show that each Defendant performed

an action that caused him to be terminated by Lifeline or prevented him from receiving DCS cases.

As to Defendants McSween and Decker, the undisputed evidence shows that McSween informed her supervisor about the conversation she had with Plaintiff, which was subsequently relayed to Decker. [Defendants' MSJ, Ex. B, ¶¶ 14-16.; Ex. C, ¶¶ 13-16.] Both Defendants determined Plaintiff should not provide services for K.L., the transgender child on the referral in question. [*Id.*] Neither McSween nor Decker took any part in the decision made by Killen, Reed, or Sparks regarding Plaintiff, nor did they know about that decision until after it occurred. [Defendants' MSJ, Ex. B, ¶¶ 15-16.; Ex. C, ¶¶ 19-22.] Plaintiff doesn't contradict this evidence— he merely argues that after McSween told her supervisors about the conversation with Plaintiff, "the remaining Defendants, then, determined that Wade could not put his religious beliefs and views aside in order to provide counseling services and set out on a course to ensure that Wade was both terminated from Lifeline and banned from providing future counseling services to DCS's clients at another provider." [Plaintiff's Response, p. 9.] In a sense, Plaintiff's argument is that if McSween and Decker had just been quiet, none of this would have happened. That doesn't provide a causal link in the § 1983 context, which imposes liability if a defendant "acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). The undisputed evidence shows McSween and Decker were

wholly unaware of the decision made by Reed, Killen, and Sparks until after it was made. [Defendants' MSJ, Ex. B, ¶¶ 15-16.; Ex. C, ¶¶ 19-22.] Simply relaying factual information about an event to other DCS employees cannot be the "cause" of any potential unconstitutional action subsequently committed by those employees. In another context, if Police Officer A told Police Officer B that there was a suspicious car in the parking lot, and police officer B found the car and arrested the occupants without reason, it is obvious that "A" did not *cause* "B's" unconstitutional action, even if B's attention would never have been drawn to the car without A's statement. So too, here. Summary judgment should be granted for Defendants McSween and Decker.

### b. Personal involvement and evidence against Defendant May

As to Defendant May, the only evidence Plaintiff cites to support his claim against May is the letter from DCS to Lifeline that May drafted and was copied on. [Plaintiff's Response, p. 9, citing Plaintiff's MSJ, Ex. F.] First, the mere drafting of a letter relaying the decision of others cannot support May's personal involvement in that decision. As the undisputed evidence shows, Reed, Killen, and Sparks made the decision to inform Lifeline that Plaintiff would no longer be permitted to provide services to DCS clients. [Defendants' MSJ, Ex. A, ¶40.] That decision was relayed to Lifeline via phone by Killen on January 24, 2018. [Plaintiff's MSJ, Ex. E, p. 5.] The letter wasn't drafted at the time the decision was made, and wasn't sent to Lifeline until January 25, 2018. [Plaintiff's MSJ, Ex. D, p. 6 (Email from Killen on January 25 indicating to recipients that "[w]hen the legal letter is ready, I will forward it to

you."); Ex. F.] The fact that May memorialized the decision of Reed, Killen, and Sparks in a letter alone cannot show that May contributed to that decision, agreed with that decision, was in a position to countermand that decision, or had any substantive involvement in the decision at all.

Plaintiff has not provided any evidence that May made, contributed to, agreed with, or otherwise had any involvement with the *decision* made by Reed, Killen, and Sparks. Nor has Plaintiff provided any evidence that would dispute Reed's declaration that he, Killen, and Sparks made the decision regarding Plaintiff themselves. [Defendants' MSJ, Ex. A, ¶40.] There is certainly no evidence that May attempted to have Plaintiff's employment terminated from Lifeline. And because May was legal counsel for DCS, Plaintiff will never be able to elicit any further information absent DCS waiving attorney/client privilege. The lone evidence against May will forever remain that he drafted the letter that was sent to Lifeline—a letter which was sent on behalf of the "Child Welfare Services" division of DCS (headed by Reed) and specifically refers any questions to Defendant Reed. [Defendants' MSJ, Ex. H.] As a matter of law, no finder of fact could reasonably find by a preponderance of the evidence that drafting a letter to a contractor memorializing a decision made by others that the contractor is already aware of itself violates the constitution.   Summary judgment should be granted for Defendant May.

   III. **Plaintiff has waived any argument that his speech was protected under *Garcetti and Pickering* because he has wholly failed to respond to Defendants' arguments**

Defendants have provided extensive briefing regarding the appropriate standard to be used in evaluating Plaintiff's First Amendment claims in their MSJ and Response to Plaintiff's MSJ, including citation to the Supreme Court's decision in *Umbehr* and the Seventh Circuit's decision in *Khuans*. Defendants now incorporate those arguments here. [Defendants' MSJ, p. 14-17; Defendants' Response, p. 8-12.] In response, Plaintiff simply argues that because this Court found that he was not an employee for due process purposes, [ECF 93, p. 5], he is not an employee for First Amendment purposes and the *Pickering* balancing test is inapposite. [Plaintiff's Response, p. 1-2.] He offers no cogent response to Defendants' citation to authority and does not even attempt to distinguish *Umbehr*. It may trouble Plaintiff that different standards are used in evaluating factually-similar claims arising under different amendments to the constitution, but the Supreme Court has made that choice for him. His failure to respond should result in waiver of his arguments and summary judgment should be granted for Defendants. *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

    **IV.**   **If the Court finds Plaintiff has made a prima facie case of discrimination under the *Pickering* balancing test, the following evidentiary issues related to the balancing test are material**

          **i.**  **No evidence supports Plaintiff's contention that Defendants' wanted Plaintiff's employment with Lifeline to be terminated**

Plaintiff materially misstates the evidence in order to provide better footing for his claims. First, he claims that Defendant Killen contacted Plaintiff's employer

"to ensure Wade's termination from Lifeline. . ." [Response, p. 4, citing Defendants' MSJ, Exhibit A, ¶¶ 37-40.] This conclusion is unsupported by the evidence Plaintiff cites, which indicates that DCS informed Lifeline that Plaintiff "would no longer be permitted to provide services to DCS clients under paragraph 49 of the contract." [Defendants' MSJ, Exhibit A, ¶40.] No facts in that Defendant Reed's declaration or any other cited evidence would allow a reasonable trier of fact to draw an inference that any Defendant wanted Lifeline to terminate Plaintiff's employment. In fact, in the same declaration Defendant Reed affirmatively states that "DCS did not request or require Lifeline to take any employment action against Mr. Wade other than his removal from DCS cases under the contract," and that "Lifeline's decision to terminate Mr. Wade's employment was, to the best of my knowledge, made solely at their discretion." [*Id.,* ¶¶ 46-47.]

Instead, the undisputed facts show that, at most, Defendants McSween and Decker did not want Plaintiff to provide counseling to K.L., and Defendants Reed, Killen, and Sparks did not want Plaintiff to provide counseling services to DCS clients at all. [*See* Defendants' MSJ, Ex. A, ¶¶ 38-45; Ex. B, ¶¶ 14-16, Ex. C, ¶¶15, 19, 21, 22.]

### b. Plaintiff's attempt to exclude certain evidence submitted by Defendants fails because he misconstrues the evidence and misapplies the rules of evidence

Defendants argued in their MSJ that Reed, Killen, and Sparks made the decision to prohibit Plaintiff from providing services to DCS clients because Plaintiff indicated that he couldn't provide services to DCS clients without expressing his

personal views. [Defendants' MSJ, p. 8, citing Ex. A, ¶¶ 38-41.] Plaintiff objects to this evidence because:

> However, this argument is factually untrue and is unsupported by the evidence cited by Defendants. Initially, Wade notes that Defendants cite paragraph 41 of the Declaration of Defendant Decker in support of their argument. Wade never had a direct conversation with Decker regarding his religious beliefs or his ability or inability to provide counseling services to any DCS's clients including to the transgendered child at issue in this case. Therefore, Decker is not in a position to offer testimony as to Wade's alleged refusal or inability to provide counseling services to transgendered individuals, and the Court should disregard Decker' testimony as hearsay.

[Plaintiff's Response, p. 5.] This argument is wrong in myriad ways.

First, the citation to Defendants' Exhibit A, paragraph 41, is the declaration of Reed, not Decker. Second, that declaration provides the factual support for how Reed came up with this knowledge: McSween talked to Wade, [Ex. A, ¶¶ 33-34], McSween talked to Sutton and Decker, [Ex. A, ¶ 35], Sutton talked to Killen, [Ex. A, ¶ 36], and Killen talked to Reed and Sparks. [Ex. A, ¶ 38]. All of this is supported by the declarations of both McSween and Decker, which the Reed declaration cites to. Third and more importantly, what Reed, Sparks, and Killen believed Plaintiff said is not hearsay at all because it is not being offered for the truth of the matter asserted—that is, it is not being offered to show that Plaintiff really couldn't provide services to DCS clients without expressing his personal views. Fed. R. Evid. 801(c)(2). Instead, Plaintiff's statement, as relayed to Reed, Sparks, and Killen, is used to show the basis upon which their decision to remove Plaintiff from DCS cases

rested. Based on the information relayed to them—accurate or not[1]—they made the decision to prohibit Plaintiff from providing services to DCS clients.

### c. Other matters

Plaintiff asserts numerous times throughout his brief that he never refused to provide counseling to K.L. and he never violated any DCS policies. [Plaintiff's Response, p. 6-7.] He also reiterates the facts he provides in his motion for summary judgment. [*Id.* at 6-8.] Defendants have responded to this evidence in their Response to Plaintiff's Motion for Summary Judgment, [ECF 125, p. 2-8], and so they incorporate those arguments here by reference. But to be clear, Defendants have never asserted that Plaintiff refused to provide counseling to K.L. or other children—just that he indicated that he would not be able to provide services *according to DCS's policies* that require him to abstain from judgmentally sharing his personal views that are adverse to those clients. [*Id.* at 3, citing Defendants' MSJ, Ex. A, ¶16 ("it is the expectation that providers and staff treat all individuals and families respectfully and nonjudgmentally, irrespective of one's personal views of sexual orientation and/or gender identity.")]

Plaintiff has *never* produced admissible evidence—not even a statement in his declaration—to dispute that he told McSween that he did not agree with the transgender lifestyle or that it would be difficult for him to provide services to K.L. without expressing his personal views to K.L. and his family. His response attempts to create a dispute of fact by citing to paragraphs 15-19 of his declaration, where

---

[1] Defendants note that Plaintiff does not refute this statement, but only argues that it should not be admissible.

Plaintiff states that he did not refuse to provide counseling services and that he did not violate any DCS or Lifeline policies. [Plaintiff's MSJ, Ex. A, ¶¶ 15-19.] Defendants directly addressed the lack of any evidentiary basis for Plaintiff's conclusion that he didn't violate any DCS policies in their Response to Plaintiff's MSJ. [Defendants' Response, p. 2-4.] But more importantly, these statements don't refute McSween's recollection of Plaintiff's conversation with her. At best, Plaintiff seems to argue that he hadn't *yet* violated DCS's policies, but that if assigned to counsel K.L. or a transgender child, he believed it would be difficult not to do so.

> **V.    Even if Plaintiff's speech was protected, Defendants were justified in prohibiting Plaintiff from having further contact with DCS clients[2]**

If this Court finds that Plaintiff's speech to McSween was protected by the First Amendment, Defendants action to remove Plaintiff from contact with DCS clients was justified to ensure the efficient delivery of government services to at-risk youth. Under *Pickering,* the government may provide an adequate justification for treating an employee's speech differently from a member of the general public. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id.*

---

[2] Defendants concede for the purposes of summary judgment only that if the Court finds that Plaintiff's speech was protected by the First Amendment that he has made a prima facie case of retaliation by meeting elements two and three of the *Pickering* analysis.

### a. Adherence to DCS's nondiscrimination policies ensures the effective delivery of government services

Defendant David Reed is the DCS Deputy Director of Child Welfare Services and is responsible for overseeing the statewide operation of all DCS-contracted service providers. [Defendants' MSJ, Ex. A, ¶¶ 3-4 8.] DCS has tens of thousands of open child abuse or neglect cases at any one time. [*Id.* at ¶¶ 5-6.] To efficiently provide services to children and families in these cases, DCS contracts with hundreds of non-governmental service providers. [*Id.* at ¶ 8.] The standard contract (and the one used in this case) with a service provider requires it to explicitly agree that if it accepts a referral from DCS, it has adequate staff with the necessary credentials to handle the referral under the terms of the contract. [*Id.* at ¶ 17, citing Ex. A, p. 3, ¶ D.] This term allows a contractor to decline a referral in the event it does not have appropriate staff to handle the referral, and allows DCS to quickly find a replacement to provide the necessary services to children and families in need. [*Id.* at ¶¶ 18-19.]

If a contractor accepts a referral, it has explicitly agreed to provide services under the terms of the contract, which includes adhering to the standardized policies listed in the contract. [*Id.* at ¶¶ 13-14, 20.] The contractor is also responsible for ensuring that the employees it assigns to a referral conform their conduct to the policies in the contract. [*Id.* at ¶ 21, 25.] Those policies include a requirement that all employees of a contractor "must be sensitive to the sexual and/or gender orientation of the family members, including lesbian, gay, bisexual, transgender or questioning (LGBTQ) children/youth. Services to youth who identify

as LGBTQ must also be provided in accordance with the principles in the Indiana LGBTQ Guidebook." [*Id.* at ¶ 15, citing Ex. F, p. 3, ¶22.] And the LGBTQ Guidebook states that "it is the expectation that providers and staff treat all individuals and families respectfully and non-judgmentally, irrespective of one's personal views of sexual orientation and/or gender identity." [*Id.* at ¶ 16.]

The terms of the contract place the onus on the contractor and its employees to abide by the applicable DCS policies for an important reason: It would not be feasible for DCS to attempt to screen each contractor's employees for each of their potential personal biases and determine whether those personal biases may conflict with the services a particular child or family requires. [*Id.* at ¶ 23.] DCS therefore expects that a person assigned to a DCS case will provide services in a non-discriminatory manner, free from any bias from their personal views. [*Id.* at ¶ 23.] And if a person assigned by a contractor fails to meet this standard, the contract provides a remedy: DCS may prohibit that person from serving DCS clients altogether. [*Id.* at ¶ 26, citing Ex. E, p. 35-36, ¶ 49.]

> **b. Because Plaintiff's speech actually caused a disruption in government services to K.L. and would work a disruption generally, DCS's action was justified**

In this case, Plaintiff's speech to McSween that he did not agree with the transgender lifestyle and that he did not believe he could provide services to K.L. and his family without expressing his personal views to them is not only the type of speech that could reasonably interfere with the efficient delivery of government services, but it actually *did* interfere with the efficient delivery of services to K.L.

Plaintiff admits the obvious: his personal views regarding transgender people could "undermine the therapeutic process" with K.L. [Plaintiff's MSJ, Ex. A, ¶ 13.] That, coupled with his statement to McSween that it would be difficult for him to provide services to K.L. without expressing his personal views, [Defendants' MSJ, Ex. B, ¶ 13], reasonably indicated to Defendants that Plaintiff was not going to be able to treat K.L. or other transgender children "non-judgmentally, irrespective of [his] personal views of sexual orientation and/or gender identity," as required by the contract. [*See* Defendants' MSJ, Ex. A, ¶ 16, citing the LGBTQ Practice Guidebook.]

Plaintiff's decision to accept this referral subject to DCS's policies and then indicate he couldn't follow those policies worked *actual* damage to the delivery of government services to K.L. As Defendant Killen indicated in her email to Lifeline on January 18, 2018, because DCS staff believed that having Plaintiff provide therapy to K.L. would risk "harm to the well-being of the child," DCS had to attempt to find another provider. [Defendants' MSJ, Ex. G.] But no other provider in the region had any openings, and Lifeline did not have another therapist available to service the referral. [*Id.*] The disruption this worked was fateful: K.L. had to be removed from his home because intensive services were not available. [*Id.*]

This incident illustrates precisely why adherence to DCS's policies listed in the contract—including providing services non-judgmentally and irrespective of one's personal views—is crucial for DCS to be able to effectively deliver government services. The consequences of a contractor accepting a referral and then indicating,

through his speech or otherwise, that he cannot provide those services in an appropriate manner can have disastrous consequences, harming children and families who need immediate assistance. Plaintiff's speech, even if protected, must be properly subject to consequence because that speech is at odds with the core mission of DCS and with the very assignments Plaintiff was given. It is not feasible to require DCS to accept a contractor's personal bias, constantly screen those biases against each individual case, and then accommodate those biases while attempting to ensure the effective delivery of services to over 20,000 children. [*See* Defendants' MSJ, Ex. A, ¶ 23.]

### c. Plaintiff's argument that because his speech was about religion it was subject to special protection (or, perhaps, no restriction at all) isn't supported by law in the Seventh Circuit

Plaintiff argues throughout his Response and his Motion for Summary Judgment that because his speech was based on his religion, it was not actionable by DCS under *any* circumstances. [*See* Plaintiff's Response, p. 12.] Not so. As Defendants' have shown in their Response, that would create the potential for absurd results that substantially hinder the efficient delivery of government services. [Defendants' Response, p. 8-12.] In addition to the cases cited in Defendants' Response, the Seventh Circuit has also decided that speech regarding religion, including religious speech concerning the LGBTQ community, enjoys no special protection in the work environment.

In *Piggee v. Carl Sandburg Coll.*, 464 F.3d 667, 673 (7th Cir. 2006), Martha Piggee was a part-time cosmetology instructor at the Carl Sandburg College. *Id.* at

668. She gave a gay student at the school two religious pamphlets on the sinfulness of homosexuality and the student complained. *Id.* Piggee wasn't retained as a teacher as a result, and she brought suit alleging violations of the First Amendment. *Id.* at 670.

Piggee's "real complaint", similar to Plaintiff's complaint here, had "to do with her ability to speak at the workplace, and in particular her ability to discuss matters of religious concern there." *Id.* In analyzing Piggee's claim, the Court noted that it was not very useful to focus on the fact that Piggee's speech was about religion or about the pros and cons of homosexual behavior. *Id.* at 671. While those topics are deserving of full debate in the public square, the real question was "whether the college had the right to insist that Piggee refrain from engaging in that particular speech while serving as an instructor of cosmetology." *Id.*[3] The Court held that there was "no reason why a college or university cannot direct its instructors to keep personal discussions about sexual orientation or religion out of a cosmetology class or clinic." *Id.* at 673.

*Piggee* dooms Plaintiff's argument that because his speech was regarding his religious beliefs, it was beyond the reach of DCS to regulate or sanction. [Plaintiff's Response, p. 12 (But, it is irrelevant that Defendants found Wade's speech or opinions offensive. Wade's speech was religious in nature; Wade's speech and beliefs were protected by the First Amendment.") (internally citations omitted).] If a cosmetology school may restrict speech regarding religion and homosexuality

---

[3] The Court did not apply *Garcetti* to this case because it found that her speech was not related to her job of instructing students in cosmetology. *Id.* at 672.

because it could interfere with their schooling curriculum, the Department of Child Services may restrict speech of a religious nature regarding Plaintiff's personal beliefs about transgenderism that have the ability to directly impact the well-being of transgender or LGBTQ children in distress.

Even if the Court reaches this interest-balancing point in the *Pickering* framework—which is should not—summary judgment should be granted for Defendants because of the weighty interests DCS has in efficiently and effectively providing services to at-risk children.

## VI. Conclusion

Defendants' McSween, Decker, and May should be granted summary judgment because they lacked the personal involvement necessary sustain § 1983 liability. All Defendants should be granted summary judgment because Plaintiff's speech wasn't made as a private citizen, wasn't on a matter of public concern, and was in any event outweighed by the interests of DCS in efficiently delivering government services to at-risk children. Finally, injunctive relief against Defendant Stigdon should be denied because there has been no First Amendment violation.

    Respectfully Submitted,

    CURTIS T. HILL, JR.
    Indiana Attorney General
    Atty. No. 13999-20

Date: November 2, 2020    By:    Jordan M. Stover
    Deputy Attorney General
    Atty. No. 29502-49
    Indiana Government Center South – 5th Fl.
    302 W. Washington Street
    Indianapolis, IN 46204-2770

Phone: (317) 232-7154
Fax:  (317) 232-7979
Email:  Jordan.Stover@atg.in.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that on November 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

                                                  Jordan M. Stover
                                                  Deputy Attorney General

OFFICE OF THE ATTORNEY GENERAL
Indiana Government Center South – 5th Floor
302 W. Washington Street
Indianapolis, IN  46204-2770
Telephone:  (317) 232-7154
Fax:            (317) 232-7979
Email:         Jordan.Stover@atg.in.gov