UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HARRY KEVIN WADE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:18-cv-02475-TWP-DLP |
| ) | |
| TERRY STIGDON in Her Official Capacity as ) | |
| Director of the Indiana Department of Child ) | |
| Services, KELLY MCSWEEN, KRISTINE ) | |
| KILLEN, DAVID REED, HEIDI DECKER, ) | |
| SARAH SPARKS, JACOB MAY, and TERRY J. ) | |
| STIGDON, ) | |
| ) | |
| Defendants. ) | |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on cross motions for summary judgment filed under Federal Rule of Civil Procedure 56 by Plaintiff Harry Kevin Wade ("Wade") (Filing No. 119) and Defendants Terry Stigdon ("Stigdon") (in both her official capacity as Director of the Indiana Department of Child Services ("DCS") and her personal capacity), Kelly McSween, Kristine Killen, David Reed, Heidi Decker, Sarah Sparks, and Jacob May (Filing No. 122) (collectively, the "Defendants"). Wade initiated this action alleging the Defendants retaliated against him in violation of his First Amendment rights. For the reasons that follow, Wade's Motion is **denied** and the Defendants' Cross-Motion is **granted**.

**I.    BACKGROUND**

In late 2017 or early 2018, DCS opened a case into the potential abuse or neglect of K.L., a transgender child (Filing No. 122-2 at 2). DCS assigned Family Case Manager Kelly McSween ("McSween") to the case, who determined that Family Centered Therapy ("FCT") would be an appropriate service for K.L and his family. *Id.* To administer FCT, DCS referred the case to

Lifeline Youth and Family Services, Inc. ("Lifeline"), *id.*, a non-governmental entity contracted to provide therapeutic services to children and families.

The contract between DCS and Lifeline permits Lifeline to either accept or decline a referral based on whether it has adequate or appropriate staff to handle the referral and specifies that Lifeline will provide services according to the most current versions of DCS's various service standards ([Filing No. 122-5 at 4](#)). In an Assurances document memorializing this agreement, Lifeline agreed, pertinent here, that it would provide "a culturally competent, safe, and supportive environment for" lesbian, gay, bisexual, transgender or questioning ("LGBTQ") youth and maintain sensitivity "to the sexual and/or gender orientation of" all family members, including "children/youth." ([Filing No. 122-6 at 3](#).) Further, a DCS LGBTQ Practice Guidebook linked in the Assurances document instructed that "it is vital that social services staff ensure all placements and services are safe and supportive" and that "[i]t is the expectation that providers and staff treat all individuals and families respectfully and non-judgmentally, irrespective of one's personal views of sexual orientation and/or gender identity." *Id.*; [Filing No. 122-1 at 3](#)–4. Contractually, if DCS became "dissatisfied with the work product of or the working relationship with [an employee] assigned to work on [the] contract and/or those individuals assigned to provide any of the services pursuant to [the] contract, [DCS] may request in writing the replacement of any or all such individuals, and the Contractor shall grant such request." ([Filing No. 122-5 at 36](#)–37.)

Lifeline, in accordance with this arrangement, accepted the referral and assigned K.L.'s case to its employee Wade ([Filing No. 122-2 at 2](#)). Wade—who, in addition to serving as a licensed counselor trained in FCT, is a Christian minister—expressed concern about his ability to counsel the family because of his religious beliefs. *Id.* In particular, Wade told McSween that he did not "understand" transgender individuals, that he did not agree with the transgender "lifestyle," and

that he would find it difficult to provide services to the family without expressing these personal views to them. *Id.* But Wade did not refuse to provide counseling services to K.L. and his family (Filing No. 120-3 at 5).

McSween informed her supervisor Sarah Sutton ("Sutton") about this conversation; who, in turn, told DCS Local Office Manager for Vigo County Heidi Decker ("Decker"). (Filing No. 122-3 at 2, 3.) Under these circumstances, McSween, Sutton, and Decker decided it would not be appropriate for Wade to provide services to K.L. and his family (Filing No. 122-3 at 3.) Following this decision, Decker asked Sutton to inform Kristina Killen ("Killen"), the DCS Child Welfare Services Manager and Regional Service Coordinator for Vigo County, about the conversation between McSween and Wade. *Id.* Decker had no further involvement in any decisions regarding Wade. *Id.* at 3.

After hearing about the conversation, Killen—who was charged with addressing issues arising with outside providers within the relevant geographic region—emailed Lifeline about the situation (Filing No. 122-7). Killen explained that while Wade said he was willing to "give it chance," and work with the family, the local DCS office did not feel it would be appropriate as the potential harm to the child was too great. *Id.*; (Filing No. 120-4 at 4). On approximately January 22, 2018, Killen contacted her direct supervisor Sarah Sparks ("Sparks") and Sparks' direct supervisor David Reed, the Deputy Director of Child Welfare Services ("Reed") (Filing No. 122-1 at 7). Thereafter, Killen, Sparks, and Reed consulted with DCS's legal counsel and concluded that under the contract between DCS and Lifeline, Wade should no longer provide services to certain DCS clients because he could not counsel transgender clients without expressing his personal views or allowing those views to interfere with his therapy. *Id.* at 7–8. Specifically, they determined that Wade's view directly conflicted with the contract DCS maintains with Lifeline,

3

which states that "service providers will provide a culturally competent, safe, and supportive environment for all youth regardless of sexual orientation." (*See* Filing No. 122-6 at 3.) Killen called Lifeline with this news on January 24, 2018 (Filing No. 120-5 at 6), and that same day, Lifeline informed her over email that it no longer employed Wade (Filing No. 122-1 at 8). The next day, DCS sent Lifeline a letter drafted by staff attorney Jacob May ("May") indicating that it was prohibiting Wade from counseling its clients and directing any inquiries to Reed (Filing No. 122-8). On January 26, 2018, Lifeline sent DCS a letter stating that Wade was no longer employed by the company (Filing No. 120-5 at 6).

Following his termination. Wade sued the Defendants under 42 U.S.C. § 1983, arguing, relevant to this Entry, that they retaliated against him for exercising his protected First Amendment rights (Filing No. 87 at 5–6).

## II.   LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation

and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

5

### III.     DISCUSSION

In his Third Amended Complaint, Wade alleges that he "engaged in speech protected by the First Amendment" by informing "Defendants that he was a Christian and that his exposure to transgender individuals was nonexistent, and that his only frame of reference for such conditions was religious in nature." ([Filing No. 87 at 5](.).) In turn, Defendants violated his First Amendment Rights by prohibiting him "from having any contact with any DCS clients." *Id.* "Defendants knew or should have reasonably known," Wade concluded, "that their actions in restricting his contact with and ability to provide counseling services to DCS clients would result in his termination as a counselor for Lifeline". *Id.* Both parties cross-moved for summary judgment on this claim, and, because these motions offer competing views of which standards to apply to their case, the Court will address them in tandem.

### A.     Liability under § 1983

"In an action under § 1983," like the one here, "the plaintiff must establish individual liability" for each defendant. *Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019) (citing *Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017)), *cert. denied*, 140 S. Ct. 1294 (2020). "[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003)). "Although direct participation is not necessary" to demonstrate personal involvement, "there must at least be a showing that [a defendant] acquiesced in some demonstrable way in the alleged constitutional violation." *Palmer*, 327 F.3d at 594.

In their summary judgment brief, Defendants first argue that McSween (Family Case Manager), Decker (local manager for Vigo County DCS), May (DCS staff attorney), and Stigdon (Director of DCS), are not liable under § 1983 because they had no personal involvement in any

decision to prohibit Wade "from having any contact or being able to provide any counseling services to any DCS clients". (Filing No. 123 at 11.) These Defendants either "did not request, were not consulted about, and played no part in the decision to prohibit Plaintiff from providing services to DCS clients." *Id*. at 13. Regarding attorney May, Defendants contend Wade "can show no personal, causal involvement because any evidence is protected by the attorney-client privilege." *Id.* at 13.

In response, Wade first argues that "each of the named Defendants directly participated in the retaliation against" him (Filing No. 124 at 9). For her part, McSween "told her supervisors about Wade's alleged unwillingness to provide counseling services to the transgendered child". *Id.* The other Defendants, Wade contends, then "determined that Wade could not put his religious beliefs and views aside in order to provide counseling services and set out on a course to ensure that Wade was both terminated from Lifeline and banned from providing future counseling services to DCS's clients at another provider." *Id.* Because "the vast majority of Lifeline's client referrals came from DCS. . . , Defendants knew or reasonably should have known that Lifeline would take whatever steps were necessary to ensure DCS's pleasure with Lifeline's services, including terminating Wade." *Id.* at 9–10.

In reply, the Defendants first argue that merely "showing that each Defendant had some knowledge of the events that underpin this case and took some action related to it is insufficient to show that each of them had the requisite 'personal involvement'" demanded by § 1983 (Filing No. 128 at 3). They contend Wade has not shown "that each Defendant performed an action that caused him to be terminated by Lifeline or prevented him from receiving DCS cases." *Id.* at 3-4.

7

The Court agrees. Wade has not shown any individual liability of McSween, Decker, or Stigdon.[1] These Defendants were in no way involved in deciding to bar Wade from counseling DCS clients—and each found out about this decision only after it was reached (*see* Filing No. 122-2 at 3; Filing No. 122-3 at 4; Filing No. 122-9 at 2). The decision to terminate Wade was made by only by Killen, Sparks, and Reed (Filing No. 122-1 at 7). As stated by Defendants, "[s]imply relaying factual information about an event to other DCS employees cannot be the 'cause' of any potential unconstitutional action subsequently committed by those employees." (Filing No. 128 at 5.)

As for attorney May, Defendants argue that Wade cannot show any individual liability on his part and any personal involvement would be shielded by the attorney-client privilege (*see* Filing No. 122-4 at 2). The attorney-client privilege protects communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice. *See Upjohn Co. v. United States,* 449 U.S. 383, 394–99 (1981). Though the privilege belongs to the client, an attorney may assert the privilege on the client's behalf. *See United States v. Smith,* 454 F.3d 707, 713 (7th Cir. 2006). To determine if a communication falls within the protection of the attorney-client privilege, courts must ask: "(1) whether legal advice of any kind was sought from a professional legal adviser in his capacity as such; and (2) whether the communication was related to that purpose and made in confidence by the client." *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010) (quotations and alterations omitted).

---

[1] In his response brief on Defendants' Motion for Summary Judgment, Wade seemingly abandons (or never intended to advance) any personal allegation claim against Director Stigdon (*see* Filing No. 124 at 3 ("Defendants (other than Terry Stigdon against whom Wade only seeks injunctive relief) were personally involved in retaliating against Wade.")). But for completeness of the record, the Court resolves any claim against Director Stigdon on this § 1983 ground.

Here, Reed, Killen, and Sparks decided to prohibit Mr. Wade from providing services to DCS "[a]fter discussing the incident and consulting with DCS legal counsel." (Filing No. 122-1 at 7.) Thereafter, May, as a staff attorney, "advised employees of DCS on legal matters relevant to the Department." (Filing No. 122-4 at 1.) Because "legal advice" was sought from May "in his capacity" as staff attorney, and any resultant communication "was related to that purpose" and "made in confidence" by the DCS officials, all evidence concerning May's involvement in the matter is protected by the attorney-client privilege. *See Upjohn*, 449 U.S. at 389. This result, of course, tracks the public interest that "agencies of the government have access to the confidential advice of counsel regarding the legal consequences of their past and present activities and how to conform their future operations to the requirements of the law." *Sandra T.E.*, 600 F.3d at 621. Accordingly, May is shielded by attorney-client privilege.

To sidestep this roadblock, Wade states that the "retaliation culminated with Wade's termination, *and the letter written by Defendant May*." (Filing No. 124 at 9 (citation omitted) (emphasis added).) While May perhaps wrote the January 25, 2018 letter from DCS informing Lifeline that Wade was no longer to be assigned DCS cases (*see* Filing No. 128 at 5; Filing No. 120-6 at 2), merely composing a letter *memorializing* a decision made on January 22, 2018 and initially communicated to Lifeline on January 24, 2018 (*see* Filing No. 120-5 at 6) does not show that he was personally involved in the decision-making process. As Reed's undisputed account of the events maintains, that *decision* was made solely by Reed, Killen, and Sparks (Filing No. 122-1 at 7).

For these reasons, the Court **grants** summary judgment for McSween, Decker, May, and Stigdon (in any allegation concerning her personal capacity) because they lacked the personal

involvement necessary in any decision to prohibit Wade from counseling DCS clients for §1983 liability (Filing No. 122).

**B.     First Amendment**

    **1.     Wade's Summary Judgment Motion**

In his summary judgment brief, Wade argues that he is entitled to judgment as a matter of law because "Defendants retaliated against [him] because he exercised his First Amendment rights". (Filing No. 120 at 1.) More specifically, he argues:

> Wade possesses certain religious beliefs about transgender that, although they may not be popular in the modern culture, they are his religious beliefs, nonetheless. Wade expressed his religious belief to Defendant Kelly McSween, and approximately a week later, Wade had lost his job as a counselor and had been blackballed in attempts to find future employment as a counselor. The undisputed, material facts clearly show that Defendants took these adverse actions against Wade because he expressed his constitutionally protected speech.

*Id*.

Relying on this Court's prior conclusion that he was not an employee of DCS, (*see* Filing No. 93 at 5), Wade contends that "the *Pickering* balancing test used by courts in determining whether a person's speech constituted speech protected by the First Amendment is inapposite," (Filing No. 120 at 6; *see Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563 (1968))[2]. In its place, contends Wade, "the test established by the Seventh Circuit in *Bridges* applies," requiring a non-government-employee plaintiff to show "'that (1) he engaged in activity

---

[2] Under the *Pickering* balancing test, a public employee who speaks as a private citizen on matters of public concern receives all of the protection that any other ordinary citizen would receive under the First Amendment's Free Speech Clause, if the government's interest in the efficient delivery of public services does not outweigh the speaker's private interest in expression. In deciding whether the balance should be struck in favor of speech of efficiency in a given case, the Seventh Circuit as examined seven factors: (1) whether the speech would create problems in maintaining discipline or harmony among coworkers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016), quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000).

protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action.'" *Id.* at 6-7 (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).  These three requirements were met, Wade argues, when (1) he expressed his protected "religious beliefs as a Christian and as a Christian minister", (2) he "was terminated shortly after expressing his religious opinions to McSween" and "Defendants took steps to ensure that [he] could not provide counseling services to DCS's clients in the future," and (3) "[i]n less than a week after Wade expressed his religious beliefs regarding and his hesitancy to counsel a transgender individual, McSween contacted the other named Defendants in an effort to oust Wade from his position with Lifeline and to blackball him from future employment." *Id.* at 7-9.

In response, Defendants urge that Wade's reliance on *Bridges* is misplaced: he—unlike the plaintiff in *Bridges*—"was not incarcerated at the time he spoke to McSween". (Filing No. 125 at 11.) Instead, Defendants argue, the *Pickering* balancing test applies, as definitively settled by the Seventh Circuit, "when an independent contractor has been fired because of her exercise of free speech." *Id.* (quoting *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1019 (7th Cir. 1997)).  Under this standard, Wade must "show that the action taken against him by Defendants 'was motivated by his speech on a matter of public concern,' [*Board of County Com'rs, Wabaunsee County, Kan. v.*] *Umbehr*, 518 U.S. [668,] 685 [(1996)], and that his speech was made as a private citizen—not pursuant to his official duties as a contractor. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)." *Id.* at 11–12.  Because neither of these conditions were met, Wade's claim must fail, argue Defendants. And, in any event, even if *Bridges* applied, Defendants contend they are entitled to qualified immunity because "it was not clearly established at the time that a state agency and its employees

11

were prohibited from taking any action against an independent contractor who they believed had espoused a view of transgenderism that was at odds with their policies regarding the treatment of LGBTQ youth." *Id.* at 13.

In reply, Wade resubmits that *Bridges* provides the applicable test when Defendants have previously argued that he "was not an employee of the State of Indiana or DCS." (Filing No. 126 at 4.) Again, under this test, Wade contends he is entitled to summary judgment. *Id.* And if *Pickering* applies, "the Court should deny the cross-motions for summary judgment" when Wade "never advised, instructed, or informed Defendants that he could not perform his counseling job to any DCS client due to his religious beliefs." *Id.* at 4, 5. Instead, Wade continues, he informed "Defendants of his religious beliefs in the event that Defendants wanted to obtain a different counselor for the client." *Id.* at 5. "At all times," Wade points out, he "agreed to provide counseling services, and he never indicated that he would allow his personal beliefs to interfere with his job." *Id.* Finally, Defendants are not entitled to qualified immunity, Wade argues, because "'the law [wa]s settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out.'" *Id.* at 7 (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012).

### 2. **Defendants' Summary Judgment Motion**

In their summary judgment brief, Defendants argue that "*Connick*, *Pickering*, and *Garcetti* control whether speech made by a public employee or contractor is protected under the First Amendment." (Filing No. 123 at 14.) Under these tests, Wade's First Amendment claims against all Defendants fail under *Garcetti*'s "official duties" test when his statements were (1) made to McSween; (2) about a DCS case he was assigned; and (3) expressed concern that his beliefs would harm his counselling abilities. *Id.* at 17–18. In short, Wade's expression "was squarely within his

official duties—consulting with DCS family case managers regarding therapy of a DCS client—and therefore falls outside the realm of constitutional protection under *Garcetti*." *Id.* at 19. But even if this conversation fell outside of Wade's official duties, "it wasn't regarding a 'matter of public concern' . . . [:] No public discourse on the issues of religion or the issues facing transgender individuals could have possibly come from [Wade]'s conversation with McSween." *Id.* Because Wade's speech "was directly related to his duties as a therapist and did nothing to advance the public discourse around either his religious views or the issues surrounding transgender individuals," *id.* at 21, it was of no public concern. Finally, because "there was no First Amendment violation," Wade can receive no "injunctive relief against Stigdon in her official capacity". *Id.* at 21–22.

In response, Wade declines to refute Defendants' claim that he made the statements pursuant to his official duties and not as a citizen on a matter of public concern, again pointing to this Court's prior conclusion that he was not an employee of DCS (Filing No. 124 at 11; *see* Filing No. 93 at 5). Instead, Wade doubles down that the Seventh Circuit's three-part test from *Bridges* applies, providing him relief when (1) his statements were about "his religious beliefs as a Christian and as a Christian minister," (2) he was terminated from his employment, and (3) Defendants wanted him fired "because he had questions and issues with transgender individuals." (Filing No. 124 at 12, 13.)

In reply, Defendants argue that Wade "has waived any argument that his speech was protected under *Garcetti* and *Pickering* because he has wholly failed to respond to Defendants' arguments." (Filing No. 128 at 6.) "It may trouble" Wade, Defendants continue, "that different standards are used in evaluating factually-similar claims arising under different amendments to the constitution, but the Supreme Court has made that choice for him." *Id.* at 7. And, under *Pickering*,

even if Wade's "speech to McSween was protected by the First Amendment, Defendants['] action to remove [Wade] from contact with DCS clients was justified to ensure the efficient delivery of government services to at-risk youth." *Id.* at 11. First, "[a]dherence to DCS's nondiscrimination policies ensures the effective delivery of government services." *Id.* at 12. This strict observance is required because it "would not be feasible for DCS to attempt to screen each contractor's employees for each of their potential personal biases and determine whether those personal biases may conflict with the services a particular child or family requires." *Id.* at 13. Second, Wade's "speech actually caused a disruption in government services to K.L. and would work a disruption generally". *Id.* Defendants argue that even if otherwise protected, Wade's speech indicated that he could not provide "services in an appropriate manner" and did "have disastrous consequences, harming children and families who need immediate assistance." *Id.* at 14-15. Finally, Defendants assert that Wade's "argument that because his speech was about religion it was subject to special protection (or, perhaps, no restriction at all) isn't supported by law in the Seventh Circuit." *Id.* at 15. Indeed, DCS should be able to "restrict speech of a religious nature," Defendants conclude, that can "directly impact the well-being of transgender or LGBTQ children in distress." *Id.* at 17.

### 3.     Analysis

"[W]hen an independent contractor has been fired because of [his] exercise of free speech"—like Wade—courts "must balance interests pursuant to *Pickering*." *Khuans*, 123 F.3d at 1019 (citing *Umbehr*, 518 U.S. at 678 (1996)). This holding definitively instructs that *Pickering* applies in the independent contractor context, foreclosing Wade's contention that his claim is subject to the lower, non-government-employee standard voiced in *Bridges*. *See also Umbehr*, 518 U.S. at 684–85 ("Independent government contractors are similar in most relevant respects to government employees . . . [and] the same form of balancing analysis [(*i.e.*, *Pickering*)] should

14

apply to each."). But before even reaching any *Pickering* interest balancing, a plaintiff must traverse "the double threshold established by" *Connick* and *Garcetti*, showing "under *Garcetti* that [ ]he spoke as a citizen rather than an employee, 547 U.S. at 418, [ ] and under *Connick* that [ ]he spoke on a matter of public concern rather than 'matters only of personal interest,'" *Connick v. Myers*, 461 U.S. 138, 147 (1983). *Harnishfeger v. United States*, 943 F.3d 1105, 1113 (7th Cir. 2019).

Wade cannot clear this obstacle. First, Wade has not demonstrated that he spoke as a citizen: his statements were made as part of his official duties. *See Garcetti*, 574 U.S. at 421 (holding "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline"). When expressing his concerns about his competence to fairly counsel K.L. and his family, Wade spoke only to his ability to provide services in his professional capacity. Because "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties," *Lane v. Franks*, 573 U.S. 228, 240 (2014), Wade's stated apprehension about his ability to perform the *core job functions* of his profession is not shielded by the First Amendment, *see Kubiak v. City of Chicago*, 810 F.3d 476, 482 (7th Cir. 2016) (citing *Davis v. Cook Cty.*, 534 F.3d 650, 653 (7th Cir. 2008)) (noting that speech is made pursuant to official job duties not just if it relates to a plaintiff's "core job functions," but rather if it is merely "intimately connected with [a plaintiff's] professional duties"). Just as a memorandum reflecting "the concern of a conscientious nurse to ensure and contribute to the smooth functioning of the ER and to advocate for the well-being of the patients under her care" received no protection, *Davis*, 534 F.3d at 653, so too are Wade's private comments

15

expressing his concerns about his ability to competently counsel a DCS client afforded no shelter under *Garcetti*.

In addition, Wade's speech was not on a matter of public concern. To be sure, "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (2014) (quotations omitted). But this "inquiry turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick*, 461 U.S., at 147–148). Regarding content, mere workplace concerns, like those expressed about job assignments, are matters of personal interest that are not protected by the First Amendment. In *Connick*, for example, the Supreme Court refused to extend protection to statements that, "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." 461 U.S. at 148. The same goes for Wade's comments: the only thing their revelation would disclose is Wade's view that he would likely be impaired by his religious views in providing FCT to K.L. and his family. As for form and context, Wade, in his own personal interest, privately made his statements to McSween. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985) (holding, under *Connick*, that a credit report did not involve a matter of public concern when "[i]t was speech *solely in the individual interest of the speaker*") (emphasis added). Instead of, for example, testifying to "a matter of significant public concern," *Lane*, 573 U.S. at 241, no public audiences received and no overarching civic purposes animated Wade's speech, *see Garcetti*, 547 U.S. at 425 ("*Exposing* governmental inefficiency and misconduct is a matter of considerable significance.") (emphasis added). The narrow focus of Wade's statements illustrates the personal—not public—concern of the statements, excluding them from protection under *Connick*.

16

Even if the Court concluded that Wade's speech could survive *Garcetti's* and *Connick*'s preliminary inquiries, the *Pickering* balancing dooms his case. Under *Pickering*, the court must balance the employee's interest—as a citizen speaking on matters of public concern—with the government employer's legitimate interests in effectively performing its mission. 391 U.S. at 568. And, under *Pickering*, this Court must adjust "for any differences between the employee and independent contractor situations." *Khuans*, 123 F.3d at 1019 (citing *Umbehr*, 518 U.S. at 678 (1996)). Governmental employer interest may, for example, take the form of promoting integrity, maintaining proper discipline, encouraging efficiency, upholding public trust, executing government functions, or advancing government policy. *See Garcetti*, 547 U.S. at 418–19. Though the government "has broader discretion to restrict speech when it acts in its role as employer," any "restrictions it imposes must be directed at speech that has some potential to affect" its operations. *Id.* at 418. In *Piggee v. Carl Sandburg College*, for example, the Seventh Circuit held that—after a cosmetology instructor at a community college was not retained when she gave a gay student religious pamphlets on the sinfulness of homosexuality—there was "no reason why a college or university cannot direct its instructors to keep personal discussions about sexual orientation or religion out of a cosmetology class or clinic." 464 F.3d 667, 673 (7th Cir. 2006). In other words, Piggee's religious speech as an instructor "inhibited her ability to perform that job" and "disrupted" at least one student's education, affecting the school's ability to deliver its curriculum effectively to students. *Id.* at 672.

Similarly, Wade's speech—that he would not be able to effectively counsel a child who is transgender and that child's family—affected DCS's ability to deliver its services. It affected DCS's integrity in providing a safe and accepting environment for vulnerable youth. It affected DCS's capacity to efficiently execute counseling services when tens of thousands of children need

17

tolerant counselors to address their pressing needs. And it affected DCS's ability to uphold the public trust in advancing its policy of helping all Hoosier children, regardless of their particular backgrounds. In contrast, as discussed above, Wade's interest was minimal—his statements were made solely to express his view that his religious beliefs would impede his ability to provide FCT to K.L. and his family. While the Court must additionally consider how Wade's independent contractor status changes this calculus, here, the difference does not cause the scale under *Pickering* to tip. Wade directly served clients on behalf of the government, furthering DCS's weighty interest in protecting and aiding children, and his speech directly disrupted DCS's operations. In this role, almost no light separates Wade from the government. DCS was justified under *Pickering* in barring Wade from counseling its clients when his views could, and did, impact its aims.

Because Wade's claim cannot survive *Garcetti*, *Connick*, or *Pickering*, the Court **grants** Defendants' Motion for Summary Judgment as it pertains to the remaining Defendants (Filing No. 122) and **denies** Wade's Motion for Summary Judgment (Filing No. 119).

### IV. CONCLUSION

For the preceding reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, (Filing No. 122), and **DENIES** Wade's Motion for Summary Judgment, (Filing No. 119), and all claims, including any for injunctive relief against Stigdon in her official capacity, are **dismissed**. Final judgment will issue under separate order.

**SO ORDERED.**

Date: 12/10/2020

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Mark R. Waterfill
ATTORNEY AT LAW
mark@waterfilllaw.com

Cameron S. Huffman
INDIANA ATTORNEY GENERAL'S OFFICE
cameron.huffman@atg.in.gov

Jordan Michael Stover
INDIANA ATTORNEY GENERAL'S OFFICE
jordan.stover@atg.in.gov